## COBE, Appellant, v. LOVAN.

**Division One, February 22, 1906.**

1. **BUILDING AND LOAN ASSOCIATION:** Sale by Directors. The board of managers of a solvent building and loan association, unaided by the consent of the stockholders, has no power to part with its assets to a stranger corporation, and thereby unsettle the vested rights of its stockholders and compel them to recognize the assignee as a new mortgagee. They have no right to absolutely transfer a loan made to a stockholder and secured by his stock and a deed of trust on his home, which, under the association's constitution and by-laws, he is entitled to repay to its board of managers monthly in small installments.

2. _____: _____: **Deed of Trust:** **Ejectment.** And where such conditions of payment are a part of the stockholder's note and deed of trust given by him to the association for money borrowed, an attempted transfer of the mortgage loan to another association by the board of managers is *ultra vires* and void, and a foreclosure of the deed of trust by the trustee at the request of the tranferee does not carry the title, and the purchaser at the foreclosure sale cannot recover in ejectment.

3. _____: _____: _____: _____: **Foreclosure: Acting Through Former President.** And where the request of the trustee to foreclose was made by the aforetime president of the transferring company, who in making the request was acting for the transferee company, it will be held that the foreclosure sale was brought about by the transferee, and not by the defunct company. The law regards substance, not form; one may not do by indirection what he cannot do directly.

4. ____: ____: ____: ____: Action of Board Required. Furthermore, the foreclosure of stockholders' mortgages held by a building and loan association is by statute placed under the supervision of the board of directors, and not under that of the president.

5. DEED OF TRUST: Ejectment: Equitable Defense: Re-demption. The answer in ejectment may plead facts showing that the trustee's deed, under which plaintiff holds by mesne conveyances, is void. It is not necessary, under all circum-stances, as a prerequisite to such equitable defense, when oth-erwise well pleaded, that the defendant ask to redeem. [Dis-tinguishing Lovelace v. Pratt, 163 Mo. 70; and Schanewerk v. Hoberecht, 117 Mo. 22.]

6. ____: Building and Loan Mortgage: Innocent Purchaser. A purchaser by quitclaim deed from the purchasing mortgagee at a foreclosure sale under a deed of trust given by a stock-holder to a building and loan association, is chargeable with notice of the contents of the deed of trust foreclosed, of the constitution and by-laws of the association referred to therein, and with all that is disclosed by his chain of title, as well as the statutes of the State, read into the transaction.

7. ____: Estoppel. The mortgagor is not estopped to show that the foreclosure of the deed of trust was utra vires and void and that the purchaser thereunder took no title, by the fact that he let the deed of trust remain of record unsatisfied for nearly ten years, and permitted the recorded trustee's deed, as indicia of ownership, to go unchallenged for two or three years after the foreclosure. Especially should that be the holding where the record of the trustee's deed did not mislead the plaintiff to his prejudice or cause any change in his position, and the other elements of estoppel are absent.

Appeal from Howell Circuit Court.—*Hon. W. N. Evans*, Judge.

AFFIRMED.

*Orr & Luster* for appellant.

(1)    The deed of trust read in evidence vested the legal title to the premises in question in the trustee therein named, and also vested in said trustee the power to sell. And such power was coupled with an interest in the land itself. And the trustee's deed read in evi-

dence passed the legal title to the grantor named therein. Schanewerk v. Hoberecht, 117 Mo. 22; Lanier v. McIntosh, 117 Mo. 508; Kennedy v. Siemers, 120 Mo. 73; Springfield Engine, etc., Co. v. Donovan, 120 Mo. 423; Biffle v. Pullman, 125 Mo. 108; Snyder v. Railroad, 131 Mo. 568; Hume v. Hopkins, 140 Mo. 65; Keet v. Baker, 141 Mo. 175; Long v. Long, 141 Mo. 352; Building & Inv. Co. v. Dunesworth, 146 Mo. 361; Markwell v. Markwell, 157 Mo. 326; Fowler v. Carr, 63 Mo. App. 486; Price v. Blankenship, 71 Mo. App. 548; Huckabee v. Billingsly, 50 Am. Dec. 183; Robinson v. Coholan, 91 Ala. 479. (2) The grantor, Lovan, is bound by recitals contained in the trustee's deed and is estopped from contradicting the same by parol evidence. Building Inv. Co. v. Dunesworth, 146 Mo. 361; Hull v. Pace, 61 Mo. App. 117; Sherwood v. Saxton, 63 Mo. 78; Day v. Breton, 63 Am. St. 461; Wilson v. South Park Commrs., 70 Ill. 46. (3) Even if the grantee in the trustee's deed purchased with notice that the recitals contained in the advertisement and trustee's deed were false, or with notice that default had not in fact been made by the defendant, still said grantor took the legal title under said deed subject to defendant's right of redemption. Springfield Engine & Thresher Co. v. Donovan, 120 Mo. 423; Biffle v. Pullman, 125 Mo. 108; Markwell v. Markwell, 157 Mo. 332. (4) If the grantee in the trustee's deed purchased with notice as above defined, still if plaintiff purchased from said grantee without such notice, defendant's right of redemption is cut off so far as this plaintiff is concerned. (5) The request for the sale was made in the name of the association by Drew as its president; then the law presumes, in the absence of evidence to the contrary, that said request was in fact made by said association. Sparks v. Trans. Co., 104 Mo. 540; Sav. Assn. v. Roscoe, 75 Mo. 408; State ex rel. v. Hupferle, 44 Mo. 154; Bank v. Bank, 107 Mo. 145; Wenscolt v. Inv. Co., 63 Mo. App. 369; Hill v.

Bank, 87 Mo. App. 606; Roe v. Bank, 67 S. W. 307; Bambrick v. Campbell, 37 Mo. App. 460. (6) If the record of the deed of trust read in evidence remained unsatisfied from March, 1890, to October, 1897, the date ·of the trustee's sale, and to the present time, and the trustee's deed was placed of record on the 24th day of November, 1897, and plaintiff has during all that time taken no steps to have said deed of trust cancelled or to redeem therefrom, and has taken no steps to cancel said trustee's deed but has suffered the same to stand upon record as indicia of ownership in the plaintiff and his grantor, the defendant is estopped and cannot re- deem as against the plaintiff in the absence of a notice to the plaintiff of anything that would render said deed of trust or trustee's deed voidable or irregular. ·26 Am. & Eng. Ency. Law (1 Ed.), 980; Day v. Breton, 102 Iowa 482; Hamilton v. Lubukee, 99 Am. Dec. 567; Kline v. Vogel, 90 Mo. 247; Ferguson v. Soden, 111 Mo. 214; Bausman v. Eads, 24 Am. St. 205; Baker v. Cun- ningham, 162 Mo. 134; Beattie v. Butler, 21 Mo. 320.

*W. P. Campbell* for respondent.

A sale of land under a trust deed, without the au- thority of the owner of the debt, is void. McGee v. Birch, 108 Mo. 336. The assignee of a security given by a bor- rowing member of a building association, has no author- ity to control the foreclosure. Lovelace v. Pratt, 163 Mo. 70. A building association having no interest in the land or the security, cannot purchase and obtain title at a foreclosure sale. R. S. 1889, sec. 2817. One claiming title under a building association must take no- tice of its corporate powers. Bank v. Oliver, 67 Mo. App. 390; Clark on Corporations, 497. A purchaser of land is charged with notice of all recitals in the deeds which constitute his chain of title, and of all facts affect- ing the title to which such recitals would lead an honest inquirer. Devlin on Deeds, sec. 1000; Wade on Notice, · sec. 313. A purchaser of land by taking a quitclaim

deed is charged with notice of the rights of the holder of the paramount title and of all equities not in writing or if in writing not required to be recorded under the registry act. And such rights may be enforced in eject- ment suit. Stoffel v. Schroeder, 62 Mo. 147; Hope v. Blair, 105 Mo. 86; Condit v. Maxwell, 142 Mo. 278. An owner in possession of land is under no obligation to would-be purchasers to bring a suit to remove a cloud from his title. 12 Am. and Eng. Ency. Law (1 Ed.), 606. Cessation of business by a building and loan as- sociation releases its members from further payment of dues. Blakely v. B. & L. Assn., 26 S. W. 295; End. Bldg. Assn., sec. 502; Thompson, Bldg. Assn., 30. The president of a building association has no power to foreclose, without special authority from the board of directors. Clark on Corp. 495; Morawetz on Private Corporations, sec. 537. The hostile declarations of re- spondent both to the trustee, and the president of the Phoenix Loan Association, were a distinct denial of the right of either to collect dues and interest, or to fore- close the trust deed, and converted his holding into an adverse holding. Benton County v. Czarlinsky, 101 Mo. 280; 1 Jones on Mort., sec. 672.

LAMM, J.—Cast below in ejectment for block 14 in Maxey's addition to the city of Willow Springs, Cobe appeals.

The petition was in conventional form, laying the ouster as of March 15, 1902.

The answer admits possession, denies all other averments, and pleads certain affirmative defenses, which may be summarized as follows: (1) adverse possession for ten years under a claim of ownership; (2) that plaintiff and those under whom he claims have not been seized or possessed of the premises within ten years; (3) that plaintiff claims title by virtue of a fore- closure by advertisement and sale under a trust deed, executed to the Willow Springs Building & Loan Asso-

ciation, a corporation organized under article 9, chapter, 42, Revised Statutes 1889—said deed of trust authorizing the sheriff of Howell county, for the time being, upon the request of said association, to make a sale on default of the payment of interest, dues and penalties as provided in the deed of trust and the constitution and by-laws of said association, for a period of six months; that such sheriff sold and conveyed the premises, but his proceedings were void for the reason that he was not requested by said association, or by anyone authorized to act for the same, to advertise and sell said premises; (4) the sheriff's advertisement, sale and conveyance, as acting trustee, are alleged to be void because there was no default; and (5) are void because they occurred several years after said association ceased to do business.

Issue having been joined, the state of the proof was such that the court ruled against respondent's defense of the Statute of Limitations, thus leaving as the sole issue the validity of the trustee's deed from the then sheriff of Howell county, as acting trustee under the Building and Loan Association deed of trust.

Stated in free outline, appellant contends that the irregularities, if any, shown in the proceedings leading up to the sale are not fatal to his right to recover under the rule laid down in Schanewerk v. Hoberecht, 117 Mo. 22, and later decisions following that case, and the cause should be reversed.

Stated in free outline, respondent contends that such irregularities were shown as rendered the trustee's deed void under the rule laid down in Lovelace v. Pratt, 163 Mo. 70, and, hence, his judgment, *nisi*, should stand.

The facts, much condensed and to some extent stated in their legal effect, are as follows:

Lovan resides in Willow Springs on the *locus in quo* as a homestead. Cobe resides in Chicago and is vice-president of the Assets Realization Company, Lo-

van and Ophelia, his wife, on the 25th day of March, 1890, conveyed the premises to Wilkinson, trustee, party of the second part, for the benefit of the Willow Springs Building and Loan Association, party of the third part, to secure a note dated March 17, 1890, due in one day to said Association, promising to pay $300 for value received with interest from date at the rate of ten per cent per annum, payable monthly on a given Monday—which note contains the following further promise: "And I promise to pay said association my monthly dues of $4 each month, as stockholder in said association, with all penalties assessed on my said stock, according to the constitution and by-laws of said association." The deed of trust contained a provision that if Lovan paid the interest when due and payable, and paid said dues and penalties according to the tenor and effect of the note, and said constitution and by-laws, then the deed should be void. But otherwise, if he failed to pay said interest when due, or failed to pay his monthly dues as stockholder as they accrue; then, in either event, the deed should remain in full force. A provision was inserted for the substitution of the sheriff as trustee upon the absence of Wilkinson from Howell county, providing that, in that event, "the then acting sheriff of said county, upon the request of the party of the third part, shall sell the property herein described, or so much thereof as may be necessary to pay said note, interest and dues and penalties thereon." Provisions relating to notice, place of sale and the executing of a deed to the purchaser are not questioned and need not be set out. The trust deed also contained the usual narration that, "Any statement of facts or recital by said trustee in relation to the non-payment of the money herein secured to be paid, and of the amount due herein, or any default in the conditions of this trust deed, the advertisement, sale, receipt of money and execution of

the deed to the purchaser, shall be received as prima-facie evidence of such fact.''

Certain by-laws of the Willow Springs Building and Loan Association were introduced in evidence. In a nutshell, they provided that there should be a president, a vice-president, a secretary and a treasurer and seven directors. That such officers and directors should constitute the board of managers of the business of the association. That every person who subscribed stock should then pay one dollar on each share and thereafter pay a like sum to the association at each stated meeting of the board of managers. That the stated monthly meetings of the board of managers should be on the first Monday after the 15th of each month for the purpose of receiving memberships, monthly dues and fines from the shareholders, interest on loans, and to loan the funds of the association, and the transaction of other business.

Lovan owned three shares. The date of his membership does not appear, and, hence, no account of payments prior to his loan can be rendered, but on giving his note for $300 and executing his deed of trust, he received $135 from the association. Thereafter, at the stated meetings of the board of managers in Willow Springs, he paid $5 monthly for the months of April to November, 1890, inclusive, making his last payment on December 2, 1890. That date was also the last time the board of managers ever met to receive dues or for any other purpose. From that day to this, as gleaned from the corporate books, there was not a corporate act done or line written by the directors or the board of managers or by the corporation itself. The corporate story of what happened may be painfully spelled out in the following from its ''Journal Book:''

Page 35 of said Journal Book is in words and figures as follows:

''Willow Springs, Sept. 18, 1890.

''Board of managers and stockholders of Willow Springs Building and Loan Association met in called

meeting for the purpose of considering the question of merging or transferring the Willow Springs Association into the Phoenix of St. Joe, Mo. Mr. Robinson, agent of the Phoenix, explained the Phoenix method of doing business and submitted a proposition for merging the association into theirs. On motion of Mr. Teeter a committee consisting of W. E. Drew, E. H. Farnsworth and S. W. Wilkinson was selected to ascertain the wishes of the stockholders of this association as to merging the two association. No other business, the meeting adjourned.

"E. H. FARNSWORTH, Sec."

Page 36 was as follows: .

"Willow Springs, Mo., Oct. 28, 1890.

"Board of managers met. Quorum present. After some discussion motion to adjourn to Saturday night, November 1, 1890. Carried. Adjourned.

"E. H. FARNSWORTH, per Patterson."

Page 37 was as follows:

"Willow Springs, Mo., Nov. —, 1890.

"Board met, no quorum. On motion adjourned to meet on December 2, 1890.

"E. H. FARNSWORTH, Sec."

Page 38 was as follows:

"Willow Springs, Mo., December 2nd.

"Board managers met. Quorum present. Minutes of Sept. 1st-18th and October 28th approved. Report of committee to arrange transfer to Phoenix filed and accepted. Show vote to transfer, Drew, Teeter, Wilkinson, T. Hughes absent, Randal, Rowe, Gaylord, Withaup, ab., Thomas. Yeas 8, absent 2.

"Bills allowed: S. W. Wilkerson, $25, services; E. H. Farnsworth, $55, services; S. W. Wilkinson, $5.25, record.

"Moves to prepare release by secretary. Motion to accept prop. of Phoenix carried. D.—, Teet, Wilk, G.—, Thos., Farn., six yeas.

"Motion to presdt. transfer bills rec. to Phoe. Motion carried to settle treasurer.  Gorman and Layker.

"Report Treas.  Allowed withdrawn.

| | |
|---|---|
| John Kelly ...... ................. | $14.85 |
| Frank Sass .... .................... | 40.90 |
| I. S. McDonald .... ................. | 18.42 |
| Mrs. S. E. Davids .... .............. | 16.75 |
| H. J. Rowe .......... ............. | 11.25 |
| Farnsworth .... ..................... | 20.48 |
| | 49.68 |
| | 22.65 |
| | ——— |
| | $194.98." |

Meditation, more or less profound, on the foregoing may result in a conclusion that there was a building and loan association in St. Joseph, Missouri, known as the Phoenix.  That on September 18, 1890, one Robinson, representing the Phoenix, appeared at Willow Springs before the board of managers, in which meeting possibly some stockholders participated, and there discussed with them a pending proposition of the Willow Springs Building and Loan Association's going out of business and "merging or transferring" itself in or over to the Phoenix.  That thereupon a committee was appointed to ascertain the wishes of the stockholders.  That another meeting was held by the board of managers in October, at which the matter was discussed, but no action taken.  That in November no quorum was present at the meeting; and that on December 2d the board of managers met, eight being present and two absent.  If the narration in the record of this meeting, to-wit. "Motion to accept prop. of Phoenix carried," be construed into the acceptance of a pending proposition (of unknown terms) on the part of the Phoenix Loan Association to take over the assets and assume the stock and other liabilities of the Willow Springs Building and Loan Association, it may be seen what happened.  If the further narration therein, to-wit, "*Motion to*

*presdt. to transfer bills rec. to Phoe."* be eyed closely
and treated to a liberal gloss, it will be further seen
what happened, to-wit, that the president of the Willow
Springs association was authorized by this cryptogram
to transfer all the bills receivable belonging to the Wil-
low Springs association to the Phoenix Loan Associa-
tion of St. Joseph, Missouri. What the next narration
means, to-wit, "Motion carried to *settle* treasurer,"
would depend somewhat on the local usage of the word
"settle" and does not call for present adjudication.
Presently after this original and astonishing mortuary
literature was spread of record, and in the same year,
the Phoenix Loan Association notified Lovan that it
held his deed of trust and "wanted so much money."
To this demand, he stood mute. The record shows that
the Phoenix association at that time held Lovan's paper
with indorsements thereon, presumably transfers made
pursuant to the action of the board of managers here-
tofore noted. Shortly thereafter there appeared in
Willow Springs the president of the Phoenix associa-
tion and other of its representatives, who made de-
mands upon Lovan and wanted to know what he was
going to do. To these demands, he replied that he
owed nothing to the Phoenix association; that he got
no money from it; that the Willow Springs association
had no right to transfer his loan to the Phoenix associ-
ation; and, further, that he owed the Willow Springs
association, but could not pay it because it was not there
to pay. Thereat, the Phoenix people demanded an
out-and-out deed to the property, which Lovan refused
to make. They then asked "what he would do?" and
he replied, "nothing," whereupon they went their ways
and he saw them no more. Matters remained *in statu
quo* until April, 1891, when there appeared an adver-
tisement by Wilkinson, trustee, foreclosing Lovan's
deed of trust. On the morning of the sale day, Lovan
notified said trustee to the effect that he had no right to
sell under the mortgage and had better not do it; that

there was no Willow Springs Building and Loan Asso-
ciation. The purport of this conversation, as we con-
strue it, is that Lovan based his objection on the theory
that he had been ready to pay the Willow Springs as-
sociation in accordance with the constitution and by-
laws, at the monthly meetings of its board of managers
and as nominated in his bond, but had been unable to
find it to do so. This notice resulted in the sale lapsing.
Time ran on and finally, in 1897, one Drew, who was the
president of the Willow Springs association at the time
of its *felo de se,* then seven years gone, made a written
request, over his title as such president, to the sheriff of
Howell county to make a sale under the deed of trust on
October 11, 1897. It seems Drew appeared in Willow
Springs and gave an advertisement signed by such sher-
iff, as acting trustee, to the printer and at that time
notified him "that the association at St. Joseph had
bought the stock of the Willow Springs association and
*that he was representing the St. Joseph association,
that he was closing matters up for them."* Thereafter
on October 25, 1897, at a sale made, the property was
struck off to the Phoenix Loan Association of St. Jo-
seph, Missouri, at the sum of $50, and such sale was fol-
lowed by a trustee's deed reciting, *inter alia,* that the
powers of the trustee were executed "at the request of
the legal holder of said indebtedness."

This deed was placed of record, and matters again
lagged along until July 15, 1899, when, upon the appli-
cation of the State Supervisor of Building and Loan
Associations, the Phoenix Loan Association was placed
in the hands of receivers by the circuit court of Buch-
anan county. [State ex rel. v. Phoenix Loan Associa-
tion, 159 Mo. 102.] Thereafter its affairs seem to have
come within the jurisdiction of the United States
Circuit Court at St. Joseph, and, on the 23d of Febru-
ary, 1902, a decree of the Federal chancellor was
handed down confirming a sale to appellant herein of
all the assets of the Phoenix Loan Association, and the

existing special master in chancery and receivers were ordered to make conveyances effectuating such confirmed sale. Thereafter, by their several quitclaim deeds, said receivers and said special master in chancery conveyed the *locus in quo* to appellant, Cobe, who thereupon instituted this suit, with the result first aforesaid.

Was that result right? We think so, because:

(1) An incorporated building and loan association differs from an ordinary corporation. Among other ways, in the fact that in an ordinary business corporation, stock is subscribed and either paid for at the time, and thus becomes the property of the shareholder, or it is partly paid for and becomes his property, subject to future calls upon his subscription; while in a building and loan association the stock subscriber is not the out-and-out owner of his stock from the start. He pays thereon a minimum monthly payment, and when these monthly payments, with his increment of gains accrued, equal the par value of the share of stock, he is entitled to receive that amount. [4 Am. and Eng. Ency. Law. (2 Ed.), 1004.] If, in the meantime, a member has borrowed on his stock, it, by pledge or operation of the loan, remains the property or quasi property of the corporation, and the loan is returned by the payment of interest and stock dues, penalties, etc.—the repayment of the loan culminating at the same time the stock itself matures, at which time, in theory at least, the corporation, or a given series of its stock, is liquidated, that is to say, the non-borrowing stockholders have their stock redeemed and the borrowers have their loans cancelled.

The loans made to borrowers, evidenced by secured notes, together with all stock subscriptions calling for periodical dues, are assets of such corporation. It is self-evident that in a solvent corporation—a going concern—these assets must be kept together to subserve the underlying purposes of the corporation itself, and

reach the end in view.  If, for instance, these assets could be separated, then the liability on the stock subscription might pass off to, and become the property by assignment of, one vendee, while the same liability in another form, to-wit, a note given by a borrowing stockholder, might pass to another vendee, and thus a double liability be asserted against a stockholder.  In the case at bar, there was no attempt on the part of the Willow Springs Association to separate those liabilities. It parted with them, lock, stock and barrel, to the Phoenix Loan Association.  That is to say, the latter undertook to become the owner of the entire stock subscriptions, as well as all bills receivable based upon loans to subscribers.

We are not dealing with the case of an insolvent building and loan association whose right to collect stock subscriptions and continue business is arrested at a given time by the hand of the law and whose assets are thereupon collected and marshaled for the purpose of winding up its affairs.  There is not a hint in this record that the Willow Springs Association was insolvent on December 2, 1890, at the time its board of managers assumed to part with its assets to a stranger corporation (whose power to purchase may well be doubted), and undertook to make its stockholders recognize a new and distant master residing in anther corner of the State.  No reason is suggested for this extraordinary performance and we are cited to no authority giving a board of managers of a building and loan association such capricious power to end its life, to unsettle the vested rights of its members, and to make such rights depend not only on the business vicissitudes incident to the selling corporation, but to take on a new burden of dangers in business vicissitudes arising in the life of the buying corporation.

What might have happened if a stockholders' meeting, duly called, had unanimously consented to such proceeding, and after a board of directors had, pursu-

ant to authority by the corporation itself, carried out such scheme, we need not consider.

Nor is it necessary for us to consider whether in a court of equity the buying corporation might have asserted and established, in a proper proceeding, equitable rights by subrogation or otherwise to the transferred assets; nor is it necessary for us to consider whether a promissory note, evidencing some incidental indebtedness to a building and loan association and not a loan to a subscriber upon stock, might, or might not be transferred by authorized indorsement. Take, for instance, the emergencies provided for by section 2811, Revised Statutes 1889, where loans are allowed to be made to others, who are not shareholders, at such rate of interest as the directors may fix in case there is no stockholders' demand. If loans so made had been rediscounted for the purpose of creating a fund to subserve a stockholders' demand, springing into existence during the life of such loan, a different question might arise. Nor are we dealing here with close questions relating to the right of a building and loan association to borrow money for legitimate corporate purposes and hypothecate stockholders' papers to secure such loan. We are dealing with the right to absolutely transfer a loan made to a stockholder and secured on his home, which, under the constitution and by-laws referred to and read into the note and deed of trust, he was entitled to repay to the board of managers of the Willow Springs Building and Loan Association, at Willow Springs, monthly in small installments. And dealing with this case we are of the opinion that the attempted transfer of this mortgage loan by said board of managers to the Phoenix association was without shadow of legal right and wholly *ultra vires*. In our view it is contrary to the reciprocal rights and duties existing between such corporation and its members, and, if the principle were once established, it would result in mischief—lift the lid of a Pandora's box of ills. This is the

general doctrine laid down in Thompson on Build. Assns. (2 Ed.), sec. 286, and is the doctrine of this court. [Lovelace v. Pratt, 163 Mo. 70; see, also, State ex inf. v. Equitable Loan & Inv. Co., 142 Mo. l. c. 342.]

(2) Appellant insists the case at bar is not on all-fours with Lovelace v. Pratt, supra, and therefore that case ought not to control this. Let us see about that. The Lovelace case was an ejectment suit, as is this. In that case the title of plaintiff to the *locus in quo* originated in the foreclosure of a building and loan mortgage, as does the title of plaintiff here. In that case, the building and loan association had transferred its mortgage security to another; so here. In that case, at the request of the transferee of such mortgage security, the trustee sold. The gist of the defense in that case was that the building and loan association had no authority to part with the security, and that a foreclosure, so procured, avoided the trustee's deed; so, too, here. And it is at this point appellant discovers what he urges is a controlling factor in the present case, and distinguishes it from the Lovelace case, to-wit, in this case the foreclosure was directed by Drew, the one-time president of the Willow Springs Building and Loan Association. If, now, it be remembered that Drew, in directing the advertisement and foreclosure, admitted he was the agent of the Phoenix association and was transacting his master's business and if we add to that admission the further contention of appellant, to the effect that, if the title to the security did not pass by the transfer, it must have remained in the Willow Springs association and, therefore, that association had the power and duty of directing a foreclosure, we have the present question presented to us in a nutshell. In disposing of it, it must be borne in mind that the law regards substance, rather than form—the spirit and essence of a thing, rather than the mere dry letter. One may not do by indirection what he can not do directly; or, as said by Valliant, J., in a case just handed down,

''If it could not be done on a straight line, it could not be done in a circle.'' To all intents and purposes the act of foreclosure in this instance was procured by the Phoenix association,. and was made for its purposes. Drew was its *alter ego,* and may not ambush or confuse his position by a mere official designation assumed for the nonce. *Qui facit per alium, facit per se.* The transaction finds its counterpart in a very ancient one in which, by uniting a borrowed hand to a real voice, a notable property transaction was brought about. As preserved in an authenticated record, it runs as follows: And Jacob went near Isaac his father; and he (that is, Isaac) felt of him, and said, the voice is Jacob's voice, but the hands are the hands of Esau. The record (of this last case) further shows that Isaac's eyes were dim and, because the hands extended to him were hairy, like Esau's, Jacob effected, in conjunction with a prior trade of birthright for a meal of bread and bean pottage, a transfer of Esau's interest, contingent and expectant, those intended for use as well as those intended for ostentation. If we may be permitted to loiter afield a moment, it may be said that Jacob by that transaction showed he was well named, ''The Supplanter,'' (*sub,* under; *planta,* sole of the foot, or heel). The record has it that in the very act of· birth, he held Esau by the heel, and certainly, by afterwards laying him by the heels, he justified his name. But we are not called to review this venerable transaction and adjudicate upon it. Live business presses, and sufficient unto the day is the evil thereof. Suffice it to say, that we see no difference in principle between the Lovelace case and .the case at bar. And this is so, because, further, Drew received no direction from the Willow Springs association whatever. His acting in its name was a mere assumption on his part in the interest, as said, of the Phoenix association. By statute law, existing at the time Lovan made

his mortgage, foreclosures of stockholders' mortgages were placed under the supervision of the board of directors, and not under the supervision of the president. Section 2813, Revised Statutes 1889, reads as follows: ". . . If the borrower fails totally in his payments during the space of six months, or if the balance due by such borrower has been allowed to accumulate until it equals the sum of six months' dues and interest, then the *board* may, in its discretion, proceed at any time to advertise for sale, under deed of trust, the property pledged to the association by such borrower . ."

(3) Lovelace v. Pratt, supra, must either be overruled, or the case before us must be controlled by it. Appellant contends that the Lovelace case is out of line with Schanewerk v. Hoberecht, 117 Mo. 22, but we think not. The answer in that case was a general denial, and this is true, generally speaking, of the cases following that. The answer in this case pleads facts showing that the trustee's deed, under which appellant holds by mesne conveyances, quitclaim deeds, is void. Under Revised Statutes 1899, section 605, a defendant may plead his legal defenses as well as his equitable defenses to a suit at law. As a general proposition, he need not ask for affirmative equitable relief, unless the case admits of it and he chooses to. It would serve no useful purpose to review the Schanewerk case and the cases following it. That case does not decide that a defendant is cut out of an equitable defense setting forth facts which, if true, show that a certain deed, upon which plaintiff must rely, is void. That case does not decide that in order to make such equitable defense, when well pleaded, defendant must ask to redeem under every and all circumstances. From whom would defendant redeem in this case, for instance? If the Phoenix corporation got no title, because its sale was brought about in violation of law, it would follow necessarily that appellant got no title; and if he held no title, there was nobody in court from whom respondent could redeem.

The learned judge, who wrote the opinion in the Lovelace case, was on the bench at the time the Schanewerk case was decided and participated in the decision of the cases following that. He, with his learned associates in Division Two, could not have been unaware of the doctrine announced in the Schanewerk case, but evidently distinguished the Lovelace case, and we think rightly so.

(4) But, says appellant, by letting the trust deed remain unsatisfied of record since 1890, and by letting the recorded trustee's deed go unchallenged, as an *indicia* of ownership, respondent is estopped to now question the validity of either as against appellant, a purchaser without notice.

To this contention respondent answers, in one form, in the pioneer figure, and warlike metaphor, following: "Lovan has done what many a good man has done under similar circumstances. He has sat quiet in his castle, blunderbus in hand, while the wolves howled and prowled through the woods. It so happened that the vice-president of the Assets Realization Company is the first to come within easy range."

The familiar elements of estoppel are wanting in appellant's case. It can not be pretended that the *indicia* of ownership, allowed to remain of record in Howell county, misled appellant to his prejudice and caused a change in his position. He was a resident of Chicago. He dickered for the whole of the assets of the Phoenix association and paid therefor the sum of $80,000. It is inconceivable, in the absence of positive proof, that the $50 purchase of the Phoenix association at Willow Springs had a feather's weight in that transaction. It comes well within the maxim, *de minimis*. Besides, appellant holds under quitclaim deeds, following the trustee's deed in question. He is no such innocent purchaser for value as would entitle him to avoid the effect of outstanding equities, but is charged with notice of the contents of the trust deed foreclosed, of

the constitution and by-laws of the Willow Springs Building and Loan Association referred to in that trust deed, and with all that is disclosed by his chain of title, as well as of the statutes of the State, read into the transaction.

In conclusion, in our opinion, respondent under the facts uncovered should be allowed, so far as this case in its present aspect is concerned, to sit unmolested under his own vine and fig tree—if such tree grows in Howell county (on which we express no opinion).

The judgment is, accordingly, affirmed.

All concur.