## V. S. COOK LUMBER CO. v. HARRIS et al.

No. 24485.    June 29, 1937.

Rehearing Denied Sept. 14, 1937.

Rainey, Flynn, Green & Anderson, for plaintiff in error.

Ames, Cochran, Ames & Monnet, for defendants in error.

WELCH, J. The parties will be referred to herein as they appeared in the trial court, where V. S. Cook Lumber Company was plaintiff, V. V. Harris defendant, and Young Pepper was intervener.

The defendant, Harris, purchased real estate upon which there was then a mortgage in the principal sum of $15,000 in favor of Local Building & Loan Association, and a second mortgage in the principal sum of $4,750 in favor of the plaintiff. Plaintiff brought suit to foreclose its mortgage, alleging default, and sought foreclosure of same subject to the prior mortgage. The building and loan association was not a party to the suit. Plaintiff also sought judgment against the defendant, Harris, upon the theory that Harris assumed payment of the indebtedness when he purchased the property. Personal judgment against Harris was denied, and the denial of same is supported by the evidence and in view of the decision upon former appeal to this court. Harris v. V. S. Cook Lumber Co., 152 Okla. 7, 3 P. (2d) 694.

Upon retrial, the cause was tried in the nature of an equitable action, and largely upon the testimony taken at the former trial, and our conclusions of the questions here are governed accordingly.

Shortly after the suit was filed, the defendant, Harris, owner of the property, obtained an assignment of the building and loan association's mortgage and the note secured thereby, to one Young Pepper. Harris paid the building and loan association $15,000 therefor out of partnership funds belonging to himself and the said Young Pepper. The note was endorsed to Young Pepper without recourse. There is competent evidence that the transaction was made for the benefit of the Harris-Pepper partnership. The trial court apparently concluded that the payment to the building and loan association by Harris did not result in a merger of the title and the lien, and this conclusion is justified by the evidence.

Pepper intervened, claiming to be the

owner of the building and loan note and mortgage, alleging same to be in default 'and seeking foreclosure thereof as a first lien. Thereafter the plaintiff, by proper pleadings, withdrew its allegations and admissions that the building and loan mortgage was a prior lien to its mortgage, and, 'among other defensive matters to the claims of defendants, alleged that the building and loan association could not sell and assign its note and mortgage to Harris or Pepper.

The trial court granted judgment of foreclosure in favor of Young Pepper for the full amount of the building and loan association's mortgage, and declared the same a first lien on the property, subject only to a certain lien for taxes paid by plaintiff, 'and such action of the court is attacked here.

Although many questions are ably argued, it is our view that the controlling question is whether Pepper was the owner and holder of the mortgage originally made to the building and loan association.

We must consider the corporate power of the building and loan association to sell and assign such a note and mortgage. It is conceded that at the time of the attempted sale thereof the building and loan association was a going concern, which eliminates any question of the right to sell where the association has ceased to operate.

Many authorities given us would appear to uphold the right of a going building and loan 'association generally to sell and assign its notes and mortgages when the same are in default, but it is doubtful if they would sustain the view that such right exists before default.

We have concluded that at the time of the sale and transfer of the note 'and mortgage there was no default, and our discussion will be understood to concern the question of the corporate power and authority of a 'building and loan association, within this state, while a going concern, to sell and assign outright and in the general course of business, the notes and mortgages taken by it from its borrowing members, secured by real estate mortgage and stock of the association purchased at the time of making the loan and as a part of the same transaction, when no default has occurred or proper action taken so as to change the nature of the respective original obligations of the members and the association.

In arriving at our conclusion that the note and mortgage were not in default at the time of the sale and transfer thereof, we note the uncontradicted evidence that on June 27, 1924, the plaintiff here, as holder of a junior mortgage, paid to the building and loan association cash sufficient to cover all installments due on the note to July 20, 1924. Plaintiff was given this right under section 10953, O. S. 1931, as follows:

"First. To redeem the property in the same manner as its owner might, from the superior lien; and,

"Second. To be subrogated to all the benefits of the superior lien when necessary for the protection of his interests, upon satisfying the claim secured thereby.'

When the money was loaned in the original building and loan transaction, the parties to the transaction entered into a contract containing numerous agreements Although these agreements were evidenced in writing principally by instruments designated as a note and real estate mortgage these instruments in reality contain many features not associated with ordinary notes secured by mortgage. They contain agreements to purchase stock in the association and to pay therefor in a certain manner The agreement as originally entered int did not specify a definite sum necessary to be paid to retire the loan. The total amount necessary to be paid was dependent upon contingencies resting in agreements o the part of the building 'and loan associa tion. The contract entered into does pro vide a method whereby many of these con tingencies and some of the reciprocal right and duties of the parties might be term nated. In this regard it contained provision that in case of failure to make the month payments for a period of three months th building and loan association might cance the stock and apply the value thereof the principal debt and declare the whole debt due and payable, with 10 per cent. i terest thereon. We are not called upon he to determine any results which might fo low from the action of the building a loan association in proceeding under the provisions of the contract further than say that until such action is taken by t building and loan 'association it appears us proper to conclude that the same rec rocal rights and duties remain with t parties to the contract which originally isted. When such action is taken, it m be, although we do not so decide here, th many of the mutual obligations between contracting parties which originally isted are thereafter terminated, and t the status of the parties then becomes th

purely of debtor and secured creditor. And so we take it that the default mentioned in the cited authorities is such a default as operates to materially change the original status of the contracting parties, and such as defeats the right of the borrowing stockholder to continue periodical payments on his stock, and to continue as the owner of same and to have the earnings of the association accrue to his benefit through enhancement of the value of his stock.

At the time of such payment by plaintiff the building and loan association had not declared the entire amount of the note due and canceled the stock and applied the value thereof on the note, which it may have had the right to do under the terms of the agreement. The stock was still outstanding and in full force and effect, and the building and loan association had taken no affirmative action which might terminate any of the original reciprocal rights, duties, and obligations undertaken between it and its borrowing stockholder. True, Harris and a representative of the building and loan association testified that it was agreed between them about June 15, 1924, that the deal would be made as was subsequently done, but we do not consider this agreement to sell and purchase sufficient to justify the conclusion that on June 15th, the building and loan association declared the entire debt due, canceled the stock, and applied the value thereof on the note, thus terminating many of the original rights and obligations of the contract, and probably reducing the status of the parties to that of simple debtor and secured creditor. The money was not paid by Harris until June 30, 1924, at which time the note was endorsed and the mortgage assigned to Pepper and the stock canceled; at that time all monthly payments had been made by plaintiff. As long as the stock remained uncanceled the status of the parties to the note and mortgage remained something more than that of debtor and creditor, and, for the purpose of our consideration here, remained the same as originally entered into.

As to the corporate authority of the building and loan association to sell and transfer the note and mortgage, we consider the statutory law under which the association exists. We find this authority, as it existed at the time of the transaction here involved, in chapter 34, art. 7, sections 5376 to 5403, C. O. S. 1921, and largely carried forward in chapter 46, art. 8, subd. A, sections 9799 to 9826, O. S.

1931, with amendments and additions, most of which are of no importance here.

An examination of the statutory provisions leads reasonably to the conclusion that the object and purpose of such associations is largely as stated in 9 C. J. page 920, section 3, as follows:

"As it is sometimes stated in the statutes relating to, and in the charters and constitutions of, building and loan associations, the principal object of a building and loan association is to create a loan fund for the benefit of its borrowing members, the underlying idea being that, by means of the system of small periodical payments provided, people of limited means will be enabled to become the owners of homes, and thrift, economy and good citizenship will thereby be promoted. * * *"

The authorized by-laws of the association here provide:

"Section 7, Purpose—This association is formed for the purpose of aiding its members, or others in the purchasing or building of homes, in carrying on business, or in accomplishing any lawful object, by lending them the funds of the association, upon real estate security, or the security of stock on which payments have already been made, with the principal and interest payable in small monthly installments; of enabling its members to invest their monthly savings with the best security, and of receiving on the same such rate of interest as may be earned thereon; and of exercising generally, all the powers, and transacting all the business, which a mutual domestic building and loan association may transact and do, as provided by law and the articles of incorporation, including all such things as are convenient, appurtenant or necessary to the carrying out of the above objects."

In Holt v. Aetna Building & Loan Ass'n, 78 Okla. 307, 310, 190 P. 872, 875, this court used the following language:

"The plan and purpose of the organization contemplates mutuality, and that the stockholders share, and share alike, in the benefits and profits as well as the losses of the association. * * *"

"See, also, 2nd Ed., section 129; Endlich on Bldg. and Loan Associations, secs. 39 and 119.

"It seems clear that under the laws of this state, as they existed at the time of the transactions herein involved, mutuality was required, and that the borrowing members were entitled to share equally in the profits with the nonborrowing members, and they could not be required to bear

more than their proportionate amount of the losses and expenses of the association."

In Southwestern Surety Ins. Co. v. Davis, 53 Okla. 332, 156 P. 213, it was held:

"Corporations possess such powers as are expressly conferred upon them by law, and such implied powers as are necessary to enable them to exercise and enjoy the powers expressly granted."

See, also, American Live Stock Com. Co. v. U. S., 28 Fed. (2d) 63, and Perrine v. Chesapeake & Del. Canal Co., 9 Howard, 172. In Mayatt v. Ponca City Land & Inv. Co., 14 Okla. 189, 78 P. 185, the following language is employed:

" '* * * A corporation * * * is an artificial being, invisible, intangible, and existing only in contemplation of law. Being a mere creature of the law, it possesses only those properties which the charter of its creation confers upon it, either expressly or as incidental to its very existence.' * * * Corporations created by statute must depend both for their powers and the mode of exercising them, upon the true construction of the statute itself.

"It may be safely assumed that a corporation can make no contracts and do no acts either within or without the state which creates it except such as are authorized by its charter. * * *"

It is not contended here that the association is expressly authorized to sell and assign the note and mortgage herein involved, and our inquiry is whether such power is impliedly granted. As aptly stated in Ashland, etc., v. Centralia, etc., Ass'n, 1 Kulp (Pa.) 38:

"Only the powers necessary for the convenient prosecution of the authorized business of the association are impliedly granted."

In Lovelace v. Pratt, 63 S. W. 383, the Supreme Court of Missouri said:

"One of the points presented by this record is with respect to the authority of a building and loan association organized under the laws of this state, while a going concern, to sell and assign its notes or bonds, executed by the borrowing members for loans. The National Loan & Investment Association was organized under the general laws of this state, authorizing the organization of such association. There are many descriptions of such an association, but none more comprehensive, we think, than that given in the case of State v. Redwood Falls Building & Loan Association, 45 Minn. 154, 47 N. W. 540, which is as follows: 'The general design of such an association may be stated, with sufficient precision for our present purposes, to be the accumulation, from fixed periodical contributions of its shareholders or members and from the profits derived from the investment of the same, of a fund to be applied from time to time in accommodating such shareholders with loans, to enable them to acquire and improve real estate by building thereon; the conditions of the loan being such that the liability incurred therefor may be gradually extinguished by means of the borrower's periodical contributions upon his stock, so that, when the latter shall be fully paid up, the amount paid shall be sufficient to cancel the indebtedness.' Prior to the act of 1895 (Sess. Acts 1895, p. 105), mutual savings fund, loan, and building associations had no power to borrow money to loan their members or others, because no such power was conferred upon them by their charters, or necessarily implied from the powers expressly granted (Grohmann v. Brown, 68 Mo. App. 630); and if no such power was conferred or implied with respect to the authority to borrow money, they possessed no power either by express statute or by implication to engage in a banking or discount business. The answer expressly alleges that 'said association did unlawfully attempt to sell, transfer and assign this said bond and deed of trust to one B. A. Jefferson,' who ordered a foreclosure thereof, etc., and this is not denied by plaintiff. That this transaction by the association was a palpable abuse of the powers conferred upon it by its charter, by which it was constituted a body corporate, is too apparent from the charter itself to admit of discussion. The object and purpose of such an organization are utterly inconsistent with the idea that any part of its purpose is to engage in the sale of the notes of its borrowers. When a corporation attempts to use powers which it does not possess—as in this case, to sell outright and assign the bonds of one of its stockholders,—contrary to the plain intent and policy of the law, its action is ipso facto null and void."

And in Cobe v. Lovan, 92 S. W. 93, the same court said:

"An incorporated building and loan association differs from an ordinary corporation. Among other ways, in the fact that in an ordinary business corporation, stock is subscribed and either paid for at the time, and thus becomes the property of the shareholder, or it is partly paid for and becomes his property, subject to future calls upon his subscription, while in a building and loan association the stock subscriber is not the out and out owner of his stock from the start. He pays thereon a minimum monthly payment, and when these monthly payments, with his increment of gains accrued, equal the par value of the share of

stock, he is entitled to receive that amount. 4 Am. & Eng. Ency. (2d Ed.) p. 1004. If, in the meantime, a member has borrowed on his stock, it, by pledge or operation of the loan, remains the property or quasi property of the corporation, and the loan is returned by the payment of interest and stock dues, penalties, etc., the repayment of the loan culminating at the same time the stock itself matures, at which time, in theory at least, the corporation, or a given series of its stock, is liquidated—that is to say, the nonborrowing stockholders have their stock redeemed and the borrowers have their loans canceled. The loans made to borrowers, evidenced by secured notes, together with all stock subscriptions calling for periodical dues, are assets of such corporation. It is self-evident that in a solvent corporation—a going concern—these assets must be kept together to subserve the underlying purposes of the corporation itself, and reach the end in view. * * *"

And further, in the same opinion:

"We are dealing with the right to absolutely transfer a loan made to a stockholder and secured on his home, which, under the constitution and by-laws referred to and read into the note and deed of trust, he was entitled to repay to the board of managers of the Willow Springs Building & Loan Association, at Willow Springs, monthly in small installments. And dealing with this case we are of the opinion that the attempted transfer of this mortgage loan by said board of managers to the Phoenix Association was without shadow of legal right and wholly ultra vires. In our view, it is contrary to the reciprocal rights and duties existing between such corporation and its members, and, if the principle were once established, it would result in mischief—lift the lid of a Pandora's box of ills. This is the general doctrine laid down in Thompson on Building Associations (2d Ed.) 286, and is the doctrine of this court. Lovelace v. Pratt, 163 Mo. 70, 63 S. W. 383. See, also, State ex rel. v. Equitable Loan & Ins. Co., 142 Mo. loc. cit. 342, 41 S. W. 916."

And in Layton v. Hough, 152 S. W. 410, by the same court it is said:

"It is true that under the law merchant, the purchase of a note carries with it its collateral. That law is always applied to negotiable notes as well as nonnegotiable. But we do not think that it applies to the notes of these building and loan companies. These notes, if correctly called so, are nonnegotiable. It will be remembered that among other provisions in them is the promise to carry the stock until the loan is fully paid, 'with all the penalties on said stock, according to the by-laws and prospectus of said company.' Under the decis-

ion of our Supreme Court in First National Bank of Trenton v. Gay, 63 Mo. 33, loc, cit. 37, 21 Am. Rep. 430, like words in a note were held to destroy its character as a negotiable instrument, referring to Ayrey v. Fearnsides, 4 M. & W. 168, where the words employed were to pay 'all fines according to rule.' Other decisions of our Supreme Court are to the same effect. See, inter alia, First National Bank of Carthage v. Marlow, 71 Mo. 618, where it is held that a stipulation to pay attorney's fees rendered the instrument neither a bond, bill of exchange nor promissory note. See, also, McCoy v. Green, 83 Mo. 626, loc. cit. 633.

"The statute itself regulating these companies, when providing in what is now section 3392, R. S. 1909, that they are nonnegotiable, does no more than put into the statute a construction that had long before been applied by the courts, in holding that notes, given to these companies, are not commercial paper. See Sappington v. Aetna Loan Co., supra. By the statute it is provided, that 'for every loan or advance made as aforesaid, a nonnegotiable note or a bond secured by first mortgage or deed of trust on real estate shall be given, accompanied by a transfer and pledge of the shares of stock of the member or members so obtaining a loan or advance. Said shares so transferred and pledged shall be held by (the) corporation as additional or collateral security for the performance of the agreements, covenants and conditions of said note or bond and mortgage or deed of trust.' As we construe this term 'nonnegotiable', as applied to these building and loan companies, it means nonassignable.

"It has always been held by our courts that these notes themselves, in the hands of the company itself, then a going concern, are not assignable by the corporation. Lovelace v. Pratt, supra, 163 Mo. loc. cit. 76, 63 S. W. 383. In Cobe v. Lovan, 193 Mo. 235, loc. cit. 242, et seq. S. W. 93. 4 L. R. A. (N. S.) 439, 112 Am. St. Rep. 480, it appears that such a company, then in articulo mortis, attempted to sell the notes of its members to another corporation, and our Supreme Court held that it could not do that, although, in Pennsylvania it was held that in winding up its affairs, title to the notes and their collateral passed to the assignee. Early & Lane's Appeal, 89 Pa. 411, loc. cit. 416. Hence, we hold, following what we understand to be the spirit of our statute and decisions, that save in the event of the liquidation of one of these companies, when the notes go to the official liquidator or assignee, these notes are not assignable and the assignee had no power to sell them."

Defendants cite, and we have considered

the text statement at 9 C. J. 953, section 65, with authorities there cited, and Endlich on Building & Loan Associations (2d Ed.) sec. 298, and the notes appearing in 4 L. R. A. (N. S.) 439, and decisions from other states. While we have considered these authorities, we are nevertheless of the view that the Missouri cases quoted from, in reasoning and conclusion, guide us to the correct principles of law applicable in the present case.

It is not intended that such an association accumulate cash assets by the outright sale of its properties, or obtain its profits and earnings by brokerage or discount transactions. The intent is that by means of the system of small periodical payments the association's cash assets will accumulate and that its profits shall accrue through the loan of such cash assets to its members.

We cannot escape the conclusion that as long as the note and mortgage were not in default, the original contract obligations between the parties remained the same. With that status the relation of the parties was not alone that of debtor and creditor, the rights and liabilities were not fixed as to specific time and amount of payments, and the nature of the contract itself precludes the idea that the contract may be sold and assigned as was attempted in this case. This court in Minnetonka Oil Co. v. Cleveland Vitrified Brick Co., 27 Okla. 180, 111 P. 326, quotes with approval from the case of La Rue v. Groezinger (Cal.) 24 P. 42:

" 'Upon the same principle, although a contract may not expressly say that it is not transferable, yet, if there are equivalent expressions, or language which excludes the idea of performance by another, it is not assignable'."

We note also further language used in the cited California case:

" 'In the next place, although the language may not show an intention that the contract should not be assigned, yet the nature of the case may be such that performance by another would be an essentially different thing from that contracted for.' "

And further:

" ' "The defendant's estimate of the solvency and pecuniary credit and standing of the plaintiff's assignors may have constituted an important inducement of the contract, without which he never would have entered into it." ' "

And so in this case, although the language of the contract may not specifically prohibit the assignment of the notes and mortgage, and although the specific words contained in the corporate authority of the building and loan association may not prohibit such assignment, yet from the nature of the contract and the object and purpose of the law authorizing the existence of the corporation, it is apparent here that the defendants in this action, as assignees of the note and mortgage, could not perform the condition of the contract.

No reason is hereby given why the sale of the note and mortgage was necessary for the benefit of the stockholders or in the interest of the object and purpose of the association. The sale here appears to be nothing more than ordinary banking or discount transaction, which in our opinion is not inherently necessary for the convenient prosecution of the authorized business of the association, and is without the scope of the corporate power and authority of the association, and we hold that such attempted sale and transfer was ipso facto null and void.

Having concluded that the defendant Pepper herein took no title to the building and loan note and mortgage, it is therefore apparent that the trial court erred in sustaining the defendant's plea for foreclosure of the same. The plaintiff admittedly holds a mortgage; this mortgage may be junior and inferior to other mortgages which may be held by parties not brought into this suit. The holder of a mortgage or a junior mortgage may resist the efforts of one seeking foreclosure of a purported prior mortgage on the grounds that the one seeking foreclosure is not the legal owner and holder thereof. 41 C. J. 443.

We expressly do not determine rights not presented herein, nor rights to relief not sought herein. We hold that plaintiff has a valid mortgage and is entitled to foreclose it; that the defendant Pepper, seeking foreclosure, claiming only under an assignment which we find to be invalid, shows no right here to relief.

The judgment is reversed, with instructions to grant plaintiff a foreclosure of its mortgage, and to deny the foreclosure of the mortgage sought by Young Pepper in his plea of intervention.

OSBORN, C. J., and PHELPS, CORN, and GIBSON, JJ., concur. RILEY, BUSBY, and HURST, JJ., dissent. BAYLESS, V. C. J., absent.